[Civ. No. 21680. First Dist., Div. One. Feb. 3, 1965.]

WILLIAM JEFFERY et al., Plaintiffs and Appellants, v. CITY OF SALINAS et al., Defendants and Respondents.

Lacey, Holbrook & Meyenberg and Werner D. Meyenberg for Plaintiffs and Appellants.

Wilson, Harzfeld, Jones & Morton and John E. Lynch for Defendants and Respondents.

BRAY, J.†—Plaintiffs appeal from judgment in a court trial in favor of defendants.[1]

---

†Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]Plaintiffs also appeal from an order denying plaintiffs' motion for a new trial. Although reviewable on appeal from the judgment, that such order is not appealable is so well settled as not to require citation of authorities.

QUESTIONS PRESENTED

(1) Was there substantial evidence before the city council that (a) plaintiffs' property was benefited? (b) All benefited property was included in the district?

(2) Were plaintiffs denied a fair hearing before the city council: (a) Because of the mayor's conflict of interest? (b) Because a councilman received evidence other than at the hearings? (c) Because the proceedings were defective?

(3) Were the assessments unlawfully based?

(4) Was plaintiffs' property unlawfully split thereby depriving them of their property without due process of law?

(5) Can a parking district be formed under the Municipal Improvement Act of 1913?

RECORD

Plaintiffs own certain property at the southeast corner of Main and East Alisal Streets in Salinas, known as the Jeffery Hotel property, and the property immediately to the rear thereof known as the Jeffery Hotel Parking Lot. The City of Salinas pursuant to the provisions of the Municipal Improvement Act of 1913 (Sts. & Hy. Code, § 10000 et seq.)[2] undertook to form a special assessment district for the purpose of providing off-street parking. To that end the following proceedings were taken by the city council: On November 13, 1961, the city council enacted Resolution No. 191 N.C.S., a resolution of preliminary determination and intention to form Parking Districts 1, 3 and 4 of Improvement District No. 61-2C. (We are only concerned with Parking District 3.) As required by section 10203 the resolution designated the city engineer as the person to whom the proposed improvement would be referred for the report required by section 10204. The same evening the city engineer submitted to the mayor and city council the engineer's report on Parking District 3 of Improvement District No. 61-2C. This report contains legal descriptions and maps of the lands and easements to be acquired, detailed plans and specifications of the improvements to be made, engineer's estimates of the total cost of acquisitions, improvements and incidental expenses, a notice inviting sealed proposals and proposal forms, forms of faithful performance and labor and material bonds, contract forms, diagram showing the assessment district and the boundaries and dimensions of the parcels of land within the district, and

---

[2]Unless otherwise noted all references to code sections are to Streets and Highways Code.

the engineer's proposed assessment upon the parcels of land within the district. The same evening the city council enacted Resolution No. 4480 N.C.S. preliminarily approving the engineer's report, and reciting that, ". . . this Council has duly considered said report and each and every part thereof, and finds that each and every part of said report is sufficient, and that said report, nor any part thereof requires or should be modified in any respect. . . ."

Also the same evening the city council enacted Resolution No. 4481 N.C.S. setting the time and place of hearing protests as Monday, December 18, 1961, at 7:30 p.m. On the same evening the city council enacted Resolution No. 4482 N.C.S. establishing the prevailing wage scale for the proposed improvement. On the same evening the city council enacted Resolution No. 4483 N.C.S. calling for sealed bids to be opened December 18, 1961, at 2 p.m. The call for sealed proposals was duly published prior to the hearing on the protests of December 18, 1961.

At the hearing before the city council on December 18, plaintiffs formally filed their verified notice of protest with the city council. At the same time, plaintiffs offered to the city council an affidavit of an investigator who surveyed the Jeffery Hotel parking lot from 8 a.m. to 8 p.m. on December 14 and 15 to determine the number of cars that used the facilities of that parking lot. At this hearing plaintiffs offered an affidavit of a civil engineer, which affidavit stated generally that the hotel property would not benefit by reason of being beyond the distance that people will travel on foot from a parking lot for the purposes of conducting businesses within establishments, and further, to the effect that property which was not included within the parking district, immediately across from the proposed parking lot on the east side of Monterey Street and which was left out of the district would be benefited because of the proposed improvement by reason of accessibility and visibility. Thereafter the hearing was continued to December 27.

At the hearing of December 27, plaintiffs presented further evidence to the city council generally along the lines of the evidence previously presented in affidavit form, and as referred to in the formal notice of protest. In addition, evidence was presented which contradicted that presented on behalf of the plaintiffs, and which was to the effect that plaintiffs' property included within the district will benefit from the

proposed improvement, and that the property generally on the east side of Monterey Street, directly across from the proposed improvement, would not be benefited thereby.

Following the public hearing, the city council enacted Resolution No. 4531 N.C.S. determining convenience, adopting the engineer's report, confirming the assessments and ordering acquisitions and improvements. By this resolution the boundaries of this parking district were established so as to include approximately one-half of the plaintiffs' property, that is, the part known as the hotel property, and at the same time excluding from the district the balance of the plaintiffs' property known as the parking lot. In adopting the engineer's report, the city council further spread the assessment among the various property owners based 50 per cent in proportion to the "weighted" area, 25 per cent in proportion to the assessed value of improvements as of the date of the engineer's report, and the remaining 25 per cent in proportion to street frontage. The resulting assessment against the plaintiffs' property was $13,661.26 which covered only one-half of their property, the balance having been excluded from the district.

Thereafter plaintiffs filed this action. The complaint alleged in the first cause of action: (1) That the Jeffery Hotel property was not benefited and, therefore, should not be included within the parking district; and (2) that property not included in the district was benefited and should have been included. Incorporated by reference was the Jeffery protest.

The second cause of action therein alleged that a fair hearing was not afforded plaintiffs for the reasons that: (1) The councilmen took tours of the proposed district which were not publicly noticed and ascertained facts therefrom which were not spread on the record at the hearing; (2) consulted with third parties outside the public hearing and received facts therefrom which were used in forming a decision.

The third cause of action alleged that the fact that the Jeffery Hotel was included within the district was arbitrarily inconsistent with the fact that its parking lot was excluded and that the fact that the division of plaintiffs' total property by placing one-half of it in the district and the other one-half outside the district effectively restricted the future development of plaintiffs' entire property.

After trial, the court below found, *inter alia*, as follows: (1) That there was substantial evidence at the hearings before the city council that the Jeffery Hotel property was benefited; (2) that substantial evidence was received at said hearings

that all benefited land was included within the district and all lands not benefited were excluded from the district; (3) that a fair hearing was afforded appellants; and (4) that the subject matter of the third cause of action was waived for the reasons that it had not been made a ground of protest before the city council, and that no evidence was offered thereon to the city council.

Judgment followed that plaintiffs take nothing by their complaint.

### 1. *Substantial evidence*

Preliminarily, it is well to bear in mind that, as here, in reviewing the action of a city council, the superior court may not hold a trial de novo, but concerns itself solely with the presence, or absence, of substantial evidence in the record made at the hearings before said council which will support the determination of the council. (*Duncan* v. *Ramish* (1904) 142 Cal. 686, 692 [76 P. 661]; *Thompson* v. *City of Long Beach* (1953) 41 Cal.2d 235, 240 [259 P.2d 649]; *Tudor* v. *City of Rialto* (1958) 164 Cal.App.2d 807 [331 P.2d 122]; *Howard Park Co.* v. *City of Los Angeles* (1953) 119 Cal.App.2d 515, 521 [259 P.2d 977]; *Fascination, Inc.* v. *Hoover* (1952) 39 Cal.2d 260, 264 [246 P.2d 656]; *Jenner* v. *City Council* (1958) 164 Cal.App.2d 490, 497 [331 P.2d 176].)

This rule has uniformly been applied not only to determinations of a city council as to benefits which will accrue to particular land by reason of public improvements (*Duncan* v. *Ramish, supra,* page 692; *Jenner* v. *City Council, supra,* page 497 ["Absent a showing of fraud or mistake, the determination by the city council that certain property would not be benefited by the creation of the parking district is conclusive. . . . The determination made by a local administrative body will be sustained if there is substantial evidence in the record to support its decision"]; *Tudor* v. *City of Rialto, supra,* p. 813; *Howard Park Co.* v. *City of Los Angeles, supra,* p. 521) but likewise to the determination of local administrative bodies generally of a city (*Fascination, Inc.* v. *Hoover, supra,* p. 265; *Thompson* v. *City of Long Beach, supra,* p. 240).

The court does not have a right to judge the intrinsic value of evidence, submitted to the council, nor to weigh it. (*Thompson* v. *City of Long Beach, supra,* p. 240.) Nor will the court consider evidence contrary to that in support of findings made by the council. (*Jenner* v. *City Council, supra,* p. 497.)

(a) *Plaintiffs' property benefited*

The trial court found that substantial evidence was received by the city council sufficient to uphold its determination "that benefit accrued to the Jeffery Hotel property in the amount of the assessment apportioned against said land."

Supporting the finding of benefit was the report of the city engineer[3] stating the proposed assessment upon the hotel lot in proportion to and in accordance with the benefits received by it.

The acting planning director of the city testified before the council that in his opinion, ". . . the Jeffery's property would be benefited by the proposed acquisitions and improvements and that the assessment of the city engineer is a fair measure of said benefits.

"That in the opinion of affiant all of the property within the boundaries of proposed Parking District No. 3 will be increased in value at least to the extent of the proposed assessment on the basis that their inclusion within the boundaries of a Parking District will relieve them of the parking requirements of Ordinance No. 260 (N.C.S.), thereby making it possible to devote a much higher percentage of said property to commercial and productive use."

Mr. Dunne, the city manager, testified that all property within the district is exempt by ordinance from providing parking in the future, while properties not in the district are required to provide parking consistent with their development.

Likewise, Mr. Axel Holm, Manager of the Salinas Wells Fargo Bank, American Trust Company, testified: "I feel very strongly that this parking area is very essential to the district designated as No. 3. The Bank has agreed to withstand a very substantial portion of the cost for that particular reason.

"It is my feeling that if we are to stop the deterioration that has taken place in that block, as well as the other blocks designated on the map, something must be done to provide parking for the people who wish to come up town to do business. I can't agree with some of the statements that have been made that the properties designated in pink [i.e., the

---

[3]Section 10204, Streets and Highways Code requires the city engineer to make such report, to include, *inter alia,* a proposed assessment "upon the several subdivisions of land in the district in proportion to the estimated benefits to be received by such subdivisions, respectively, from the improvement."

property of protestants, including plaintiffs] won't be bene-
fited by the parking area. I feel very definitely that they will.
And I think it is most important that we get this matter
settled if we are going to retain the uptown parking, or
uptown business area, and get this matter settled at this time.''

Salinas has an off-street parking ordinance (Ord. 260
N.C.S.) which requires property owners to supply a certain
amount of off-street parking proportionate to their develop-
ment. Those property owners who are included in the parking
district are relieved of the effects of this ordinance, thereby
benefiting their property.[4] Plaintiffs contend that this is not
a benefit for the reason that there is no assurance that that
ordinance will remain in effect. Plaintiffs' contention that the
benefit accorded its lot by relief from the operation of Ordi-
nance 260 N.C.S. would apply equally as well to property
several miles from the proposed improvement overlooks the
fact that the benefit from the proposed parking lot is limited to
property within a reasonable distance of that lot. Moreover,
the purpose of the district was to improve the parking situation
in the downtown area.

There is an abundance of testimony before the city council
with reference to the decentralization of and damage to the
downtown area caused by lack of off-street parking. The pur-
pose of the parking district is to alleviate the downtown
parking problem from its present decentralized character.
It would not seem reasonable that the city council would in
the future repeal the ordinance and recreate the decentralized
parking facilities.

There was evidence that appellants' hotel property was close
enough to the proposed parking lot improvement to be within
the range of benefit, although there was evidence to the con-
trary.

The city engineer testified in detail that the Jeffery
Hotel parking lot was inadequate. Plaintiffs' expert testified,
also in detail, that it was completely adequate. This merely
created a conflict in the evidence the resolution of which by
the city council binds us. It should be noted that, using the
standard provided in Ordinance 260 N.C.S., the hotel parking
lot was grossly inadequate. Such an ordinance and the stand-

---

[4] ''Benefit'' is usually considered as tending to reflect enhancement in
the market value of property. (*Howard Park Co.* v. *City of Los Angeles*
(1953) 119 Cal.App.2d 515, 522 [259 P.2d 977].) Local zoning ordi-
nances are matters which help determine market values. (See *People
ex rel. Dept. of Public Works* v. *Donovan* (1962) 57 Cal.2d 346, 352
[19 Cal.Rptr. 473, 369 P.2d 1].)

ards set forth therein carry a presumption of reasonableness. (See Code Civ. Proc., § 1963, subd. 15.) There was testimony that so-called Mid-Town Lane made the Jeffery Hotel lot more accessible to the district parking lot. In spreading the assessment the city engineer testified that distance from the parking lot was a prime factor in fixing the amount of the assessments.

(b) *All benefited property included*

■ The trial court found that the evidence at the council hearings was sufficient to uphold its determination that all of the land benefited by the district was included in the district and all land not benefited was excluded.

The city engineer's report supports this finding as does his testimony. Plaintiffs' main contention that benefited land was not included is based on the fact that the properties on the east side of Montgomery Street directly across from the districted property were not included in the district. The city engineer testified that none of these properties would be benefited by the district because (1) they had more than adequate parking already, and (2) that Monterey Street being a heavily traveled thoroughfare and therefore, being difficult to cross (it is the principal traffic artery from North Salinas to the south and east and is the alternate route to U. S. 101), constituted a substantial physical separation, a barrier to the people on the east side of the street using the proposed parking lot.

Plaintiffs now contend that the exclusion of their hotel parking lot from the district was improper as it is benefited by the proposed improvement. In its protest before the council and at the hearings thereof, plaintiffs did not raise this issue. The only issue as to property excluded and yet benefited raised before the council was concerning the properties on the east side of Monterey Street. At the trial plaintiffs sought to inquire of the Salinas Mayor whether, when he voted for the formation of the district, he considered the hotel parking lot to be benefited. The court sustained objections to such inquiry on the grounds of irrelevancy and immateriality inasmuch as the findings of the council were embodied in the resolution forming the district.

Plaintiffs made an offer to prove that the mayor in a deposition had stated that when he voted for the formation of the district he thought that lot would not be benefited as long as it remained a parking lot but would be benefited if later on a building were constructed on it. The theory upon which

plaintiffs claim the testimony is admissible is that it would prove that the mayor voted for the district by mistake or fraudulently. However, plaintiffs' complaint does not plead mistake or fraud. ▆▆ In this type of proceeding fraud or mistake of the council or a councilman must be pleaded ". . . in specific language . . . of the acts which are relied upon." (See *Jenner* v. *City Council* (1958) 164 Cal.App.2d 490, 501 [331 P.2d 176]; *Maxwell* v. *City of Santa Rosa* (1959) 53 Cal.2d 274, 278 [347 P.2d 678]; *Hannon* v. *Madden* (1931) 214 Cal. 251, 267 [5 P.2d 4].)

The court found that at the council hearings plaintiffs failed to raise any issue as to whether the hotel parking lot would be benefited and offered no evidence thereon, even though they knew in advance the lot was to be excluded. Therefore, the court concluded as a matter of law, that plaintiffs had waived any right to have such an issue determined by the council or the court. Failure to raise the issue in the protest constitutes a waiver thereof. (*Roberts* v. *City of Los Angeles* (1936) 7 Cal.2d 477, 493 [61 P.2d 323]; *Keller* v. *City of Los Angeles* (1932) 123 Cal.App. 99, 103 [11 P.2d 448].) Moreover, while there was evidence that the hotel parking lot was not benefited by the district there was no evidence to the contrary.

2. (a) *Fair hearing—mayor's interest*

▆▆ The Mayor of the City of Salinas presided over the hearings for the formation of the parking district. He voted to overrule plaintiffs' protest and in favor of all resolutions leading to the formation of the district. He affixed his signature to a petition for the formation of the district in his capacity as president of the Board of Trustees of The Hall Association of Salinas Lodge, B.P.O.E. The Hall Association's property is immediately adjacent to the proposed improvement. The mayor did not reveal either to the other members of the city council or to the opponents of the district, that he had signed the petition for the formation of the district. Plaintiffs contend that because these facts remained undisclosed they were prevented from having a fair hearing before the city council.

As stated in their closing brief, plaintiffs ". . . do not, nor never have, contended that these facts [the signing by the mayor in his lodge representative capacity of the petition for the formation of the district] resulted in Mayor Atteridge being disqualified in this matter. They contended, however, that because these facts remained *undisclosed* they were pre-

vented from having a fair hearing before the city council."[5] (Italics added.) While it probably would have been better for the mayor to have disclosed at the hearing that he had signed the petition, we cannot see how his failure to do so deprived plaintiffs of a fair hearing, in view of the rule, which plaintiffs admit exists, that even if he personally owned property which would be affected by the formation of the district, he would not have been disqualified from participating in the hearing and voting. Had the mayor disclosed his situation, plaintiffs could not have disqualified him from acting.

It should be pointed out that the petition for formation of the district which the mayor signed is a public document, was present at the hearings, and the fact of his signing it was readily ascertainable. Plaintiffs' claim of lack of fair hearing in this respect is based upon *Safeway Stores, Inc.* v. *City of Burlingame* (1959) 170 Cal.App.2d 637 [339 P.2d 933]. That case is easily distinguishable from the case at bench. There, a special attorney was employed by the city council to prepare and supervise the proceedings for the formation of an assessment district pursuant to the parking district law of 1951. He owned property within the proposed district. This fact was never disclosed. The court held that this was a "flagrant violation of legal ethics," but did not discuss whether it made the formation of the district void. As said in *Federal Construction, supra,* and other cited cases on the subject, the rule that a councilman interested in property within a proposed district is not disqualified from acting in the formation of the district is one of necessity. There is no one to take his place on the council if he were thereby disqualified. As to special attorneys, the rule would not necessarily apply. The council is not required to employ any particular attorney.

2(b) *Councilman receiving evidence other than at the hearings.*

Councilman Beck testified that sometime before the formation of the district he talked to Bob Bello who did not own

---

[5]That the mayor was not disqualified from voting for the formation of the district by his having signed said petition appears from the well-settled rule that ownership of property in a proposed assessment district does not disqualify a city councilman or other public officer from voting on the formation of such district. (*Federal Construction Co.* v. *Curd* (1918) 179 Cal. 489, 494 [177 P. 469, 2 A.L.R. 1202]; *Raisch* v. *Sanitary Dist. No. 1* (1952) 108 Cal.App.2d 878, 884 [240 P.2d 48]; see *Grosjean* v. *Board of Education* (1919) 40 Cal.App. 434, 441 [181 P. 113]; *Butler* v. *Scholefield* (1921) 54 Cal.App. 217, 231 [201 P. 625]; *Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 366 [139 P.2d 908]; *Fish* v. *State Bar* (1931) 214 Cal. 215, 225 [4 P.2d 937].)

property "on that street--or on that block" but whose property "front[s] or back[s] up against this new improvement." The talk was "Very general with respect to the advantage of rear parking." They "were affirmative in seeking back parking." He also talked to Mr. Baker whose "business back[s] up or front[s] on this parking improvement," generally concerning "the advantages of rear parking." Beck could not tell when the talk with Bello took place.

On one occasion Beck "made a visual survey of District 3." To do this he "looked generally to see what occupancy was in the buildings so that I would be better able to identify them at subsequent council meetings."

Councilman Beck did not disclose to the other members of the council what he saw in the visual survey, nor what he learned in the talks with Bello or Baker. Plaintiffs contend that Beck's actions in making the visual survey and in talking to Bello and Baker and not disclosing the information thus obtained to his associates on the board and to the protestants at the hearings deprived plaintiffs of a fair hearing. Plaintiffs rely primarily on *Safeway Stores, Inc.* v. *City of Burlingame* (1959) 170 Cal.App.2d 637, 647 [339 P.2d 933], where we said: "True it is that the council received for the record the written protests of the protestants and heard their oral protests, but in addition the members of the council, either individually or collectively, viewed the locale and conferred with the petitioners or their representatives, thereby receiving so-called facts upon which they apparently relied in coming to their judgments. These so-called facts gleaned by them through observation and hearsay were not recited at all in the record, and consequently were unknown to the protestants and hence could not be met or overcome by them. Under those circumstances, can it be said that a fair hearing was had? We think not!"

However, councilman's vote was not necessary to form the district and confirm the assessments. All that is required is a four-fifths vote of the council. As the vote of all five of the councilmen was unanimous, Beck's vote can be disregarded, and still the action of the council is valid. (See *Hannon* v. *Madden* (1931) 214 Cal. 251, 266 [5 P.2d 4]; *Howard Park Co.* v. *City of Los Angeles* (1953) 120 Cal. App.2d 242, 246 [260 P.2d 980].)

No evidence was offered to support the allegation in the second cause of action in plaintiffs' complaint concerning tours of the proposed district by the councilmen.

2(c) *The proceedings were not defective.*

Plaintiffs feel that the district was improperly formed because they claim that the formation proceedings were defective, principally because on the same evening Resolution No. 191 N.C.S., the resolution of preliminary determination and intention with regard to the formation of this parking district by which the same was first officially referred to the city engineer of Salinas for his report, was adopted; the city engineer's report was presented; and the city council enacted Resolution No. 4480 N.C.S. preliminarily approving the engineer's report. In this resolution the council recites that it "has duly considered said report and each and every part thereof, and finds that each and every part of said report is sufficient, and that said report, nor any part thereof requires or should be modified in any respect."

At the trial plaintiffs sought to inquire of the city engineer as to whether the engineering report, plaintiffs' exhibit No. 6, was prepared at the direction of the city council pursuant to Resolution No. 191 N.C.S., or whether it had been prepared prior thereto at the direction of persons other than the city council. The court sustained an objection to this line of inquiry.

Plaintiffs feel that because the time of the approval of the petition and the filing of the engineer's report took place on the same night that this caused a defect in the formation proceeding which would make the district void. In support of this contention plaintiffs cite *Safeway Stores* v. *City of Burlingame, supra.* In that case the city was preparing to form a parking district. An engineering firm was retained in May of 1955 to make a report and recommendation for the formation of the district as required by section 35257 of the Streets and Highways Code. However, the petition for the district was not filed until September of 1955. The petition was approved in November of 1955 and the engineer's report was then filed. " 'The legislative body shall either approve the petition or reject it. *If it approves the petition, it shall direct* the city engineer or other competent person to make and file with it a report showing . . .' (Emphasis added) That is, the action provided by said section is not to be taken until *after* the petition has been approved. Here, the engineers were retained by the city several months before the petition was filed. *However, this is merely a technical objection.*" (Italics added.) (*Safeway Stores, supra,* p. 649.)

In regard to the proceeding which formed the parking

district, the lower court concluded as a matter of law: "Parking District No. 3 was duly and regularly formed and established under and pursuant to the provisions of Municipal Improvement Act of 1913 and Section 17 of Article XIII of the Constitution of the State of California, and the proceedings therefore were in all respects regular and in accordance with the law."

Resolution No. 4480 N.C.S. preliminarily approved the engineer's report and set the time and place for hearing protests against the proposed improvement. There was no district until the council acted after that public hearing. (This plaintiffs conceded.) The district was formed when Resolution No. 4531 was adopted by the council after the public hearings of December 18, and December 27. ▆▆▆ The fact that the reference to the city engineer, the filing of his report and its approval by the city council took place the same evening did not invalidate the proceeding. In city work, in order to expedite matters, it is quite customary for the city engineer to be prepared to submit a report to the council before it is actually called for. As said in *Safeway Stores, supra,* the objection to this procedure is a technical one. The important question is the sufficiency of the report. At the public hearing thereafter held, plaintiffs had abundant opportunity to point out defects in the report, if any.

Plaintiffs' protest filed at the December 18 hearing stated, "The proposed assessment against each parcel of property in the parking district was not determined by the City Engineer." No effort to prove this statement was made. In fact, plaintiffs' counsel stated at the December 27 hearing that he did not wish to make any proof of this "and it could be that at this time we have passed this particular phase of it."

In *Capital Freight Lines* v. *City of Sacramento* (1962) 206 Cal.App.2d 279 [23 Cal.Rptr. 752], it was contended that the failure of a city clerk to mail to affected property owners any notice of the adoption of a resolution of intention to improve certain streets, although required by section 5194, Streets and Highways Code, did not deprive the city council of jurisdiction to proceed despite that omission, because the assessment against the property owner's land was later levied and a hearing on their objections to the assessment had.

The court said, "It has also been held that notice of proceedings merely to determine whether the contemplated improvement should be made is not required by due process of law. A hearing on the assessment suffices." ▆▆▆ So in our

case plaintiffs had a hearing on their protest to the formation of the district before the district was formed.

Plaintiffs were not prejudiced nor denied a fair hearing because the city engineer's report was prepared beforehand.

3. *Basis of assessments*

In spreading the assessment for the proposed parking district costs, the city engineer spread one-quarter of the assessment based on the assessed value of the improvements on the respective parcels of land included within the district. The plaintiffs contend that it was improper for any assessment to be made on the basis of the improvements on the land. To support this argument plaintiffs cite section 10204 of the Streets and Highways Code (Municipal Improvement Act of 1913). This code section pertains to the engineer's report which was submitted to the city council for their approval. The pertinent part of the section reads:

"The report of the person or board to whom the improvement is referred by the legislative body shall contain:

(e) . . . proposed assessment of the total amount of the cost and expenses of the proposed improvement upon the several subdivisions of *land* in the district in proportion to the estimated benefits to be received by such subdivisions, respectively, from the improvement. . . ." (Italics added.)

Plaintiffs emphasize the use of the word "land" in the code section. It is their theory that "land" when used in this code section has a literal meaning, that is, "Land is the solid material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock or other substance." (Cal. Civ. Code, § 659.) Based on this definition, improvements cannot be considered a part of land. Therefore, plaintiffs contend, when the Streets and Highways Code uses the word "land" it is meant to exclude the improvements on the property.

The plaintiffs' argument is meritless. The cases which plaintiffs cite in favor of their argument are of little help to their cause. In *Krouser* v. *County of San Bernardino* (1947) 29 Cal.2d 766 [178 P.2d 441], the Supreme Court was asked to decide whether the word "land" meant land only or land with its improvements. That case involved the formation of a municipality. The statute under which the municipality was to be formed required that the signers of the petition own 25 per cent of the value of all land to be incorporated. The question there was did the word "land" mean land and improvements or merely land without the improvements. The

court was confronted with the interpretation of the word "land" as used in section 2 of the Municipal Corporation Act. The court said on page 771:

"The word 'land' used in section 2 of the Municipal Corporations Act should be interpreted in accordance with the legislative definition of section 659 of the Civil Code, as 'the solid material of the earth,' unless it is clear that the Legislature intended the broader and all-inclusive meaning of land and improvements." In arriving at this conclusion the court on page 769 had this to say about the use of the word land: "It is true that the word 'land,' both legal and popular parlance, more frequently than not, includes both land and improvements."

The court further stated on page 770: "In assessing benefits under conservation district and similar statutes, it has been held that land is synonymous with real property and includes improvements. [citations]. . . . The word 'land' was held to include dwellings and other structures in assessing the cost of a street improvement [citations], and for purposes of assessment in the organization of a drainage district [citations]."

It is clear from the language of the *Krouser* case that the court was not laying down the rule that the word "land" when used in a statute necessarily meant only land and not land and its improvements. Rather the court was merely saying that the use of the word "land" in that particular statute; namely, section 2 of the Municipal Corporations Act, must be construed to mean land exclusive of its improvements.

The other cases cited by plaintiffs on this subject are not in point because in each the court was not passing on the question of whether the use of the word "land" included the improvements on the property.

It is quite reasonable for a local improvement district to assess the value of property within the district using the improvements on the land as well as the bare soil. (*Southern Pac. Co.* v. *County of Riverside* (1939) 35 Cal.App.2d 380 [95 P.2d 688]; *City of Los Angeles* v. *Howard* (1937) 23 Cal.App.2d 624 [73 P.2d 1234]). The *Howard* case involved an appeal from a judgment restraining the defendant from removing five dwelling houses from two lots which were sold to the city to satisfy a lien to secure the payment of delinquent street assessments levied under the provisions of the California Street Opening Act of 1903. Section 16 of that Act required the street superintendent to assess the cost

"upon and *against the lands* . . . in proportion to the benefits to be derived from the improvement." There the appellant took a similar position to the plaintiffs in this case. That is, the appellant thought the assessment attached only to the "land" and not the "improvements" thereon. The court stated at page 627:

". . . And section 16 requires the street superintendent of the city to assess the total expense of the proposed improvement 'upon and *against the lands* . . . in proportion to the benefits to be derived from said improvement.' It is evident that the terms 'property', 'lands', 'lots', 'pieces', 'parcels', and 'real estate', affected by the special assessments, are used interchangeably, and that the Legislature did not intend to thereby create a lien only upon the earth or soil of the assessed property as distinguished from the fixtures or improvements thereon. As it is said in the case of *Ex parte Hill, supra* [194 Ala. 559 (69 So. 598)], which was a similar street improvement proceeding wherein the same limited construction of the term 'land' was insisted upon:

" 'We do not think that the giving of same (instruction) was reversible error, as the words "lands" and "property" are used interchangeably. The benefits to lands was all that was involved and the term "land" would include the house and everything that was a part of the realty. The word "land" included all property that could have possibly been specially benefited as a result of the improvement.' "

"The fixed improvements on the land, for the purpose of a special assessment under the Street Opening Act, are necessarily included within the terms 'property', 'land', 'real estate', as they are used in the statute, and the lien therefore extends to such improvements as well as to the land or real property upon which they are constructed. . . ."

". . . In reading the entire Street Opening Act, as we have indicated, we are convinced the phrase, 'lots, pieces or parcels of land' was not used by the legislature to limit the assessment to the bare soil to the exclusion of improvements or fixtures which exist thereon. Like the lien created by a mortgage under section 2926 of the Civil Code, special assessments under the statute in question are impressed upon everything that would pass by a grant of the property."

In arriving at that conclusion, the court in the *Howard* case studied the entire Street Opening Act. We look to the entire Municipal Improvement Act of 1913 (Sts. & Hy. Code, § 10000 et seq.) to ascertain what the Legislature meant by the meaning of the word "land," (see *Southern Pac. Co.*

v. *County of Riverside, supra,* p. 381 and *City of Los Angeles* v. *Howard, supra,* p. 626.) Section 10204, relating to the contents of the engineer's report at subdivision (e) thereof, refers to ". . . assessment . . . upon the several subdivisions of *land*", and also, "the assessment upon *property* proposed in the report. . . ." (Italics added.) Section 10428 provides the ". . . special assessment . . . is a lien upon the *land.*" Section 10307: ". . . assessed against the particular *parcel.* . . ." Section 10407: ". . . the tax collector shall begin the publication of notice of sale of the *property* upon which the assessments have not been paid." Section 10409: ". . . tax collector shall mail . . . notices of sale to owners of all *property* upon which the assessments have not been paid. . . ." The same section refers to "various *parcels,*" "each *parcel,*" "assessed against the *property.*" Section 10411 uses *"parcels of land"* and "assessment . . . due on the *property* . . ." interchangeably. (Italics added.) Without continuing the recital, the same thing is true of sections 10412, 10413, 10415, 10417, and 10422.

It seems apparent that the Legislature was using "land," "property," "parcels of land," "subdivisions of land" interchangeably and in their ordinary meaning and to include improvements on the property. It is to be noted that the Legislature used the word "property" continually throughout the act. ▉ With regard to the use of the word "property" the court in *Southern Pac. Co.* v. *County of Riverside, supra,* at page 387 said:

" 'Property' has a much broader meaning than does 'land' or 'real property.' It is thus defined in Black's Law Dictionary: 'The word is also commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate.' "

*4. Splitting of plaintiffs' property*

▉ The district includes approximately one-half of plaintiffs' entire property (the portion on which the Jeffery Hotel is located) and excludes the other portion now used as the hotel parking lot. Neither in the notice of protest filed by plaintiffs with the city council nor at the hearings did plaintiffs make any objection to this "splitting" of their lot. Apparently at that time they were satisfied not to have the whole parking lot liable for district assessments. Before the

trial court and now, they contend that such splitting of their property is in direct contravention of the Municipal Improvement Act of 1913 which requires the assessment to be ". . . spread upon the several subdivisions of land in the district . . . ." (Sts. & Hy. Code, § 10204, subd. (e).)[6] The trial court found that plaintiffs before the council had failed to raise the issue as to whether the Jeffery Hotel property was a separate subdivision within the meaning of said act and whether the hotel parking lot was benefited by the proposed district and should have been included therein. Further, the court found that plaintiffs offered no evidence at the hearings to the effect that the parking lot was not a separate subdivision of land within the meaning of the act nor that the lot was benefited and should have been included in the district. The court then held that the failure to protest and to offer evidence on the matter, constituted a waiver by plaintiffs of any right to have the matter determined by either the council or the court. This ruling was correct. (See *Roberts* v. *City of Los Angeles, supra,* p. 493; *Keller* v. *City of Los Angeles, supra,* p. 106; *Hannon* v. *Madden, supra,* p. 260; *Tudor* v. *City of Rialto, supra,* p. 813.)

The plaintiffs contend that such issues were raised by the protest. They point to such wording as that the proceeding for the formation of the parking district and the formation thereof, were unlawful and void and that the formation of the parking district was not in compliance with the Municipal Improvements Act of 1913. This argument is without merit. These are merely general protests and do not specify on what grounds the council should find for the plaintiffs nor do they specify the grounds now urged.

5. *Municipal Improvement Act of 1913 provides for parking districts.*

Plaintiffs contend that the parking district could not be formed under the Municipal Improvement Act of 1913 but that defendants should have used the Vehicle Parking District Law of 1943, section 31500, et seq. of the Streets and Highways Code or the Parking District Law of 1951, section 35100, et seq. of the same code.

---

[6] It is very doubtful if the word ''subdivisions'' in the phrase ''subdivisions of land within the district'' refers to any land other than that included in the subdivisions shown on the map of the district as being within the district. If plaintiffs' argument were sound, an assessment district would have to include in a district the entire property of the person owning several acres of land even though only the frontage on the proposed improvement were benefited.

It should be noted that the two parking district acts cited are not intended to be the exclusive means used in the formation of a parking district. (See § 31517 and § 35110, Sts. & Hy. Code.) These two code sections specifically indicate that they are merely alternative procedures for the same subject.

The district in question was formed under the Municipal Improvement Act of 1913 (Sts. & Hy. Code, §§ 10000-10609.) Section 10100 provides in pertinent part, ''Whenever the public interest or convenience requires, the legislative body of any municipality may install in or along its streets all or any of the following:

(e) Any works, utility, or appliances necessary or convenient *for providing any other public service.*'' (Italics added.)

Section 10102 provides: ''Whenever the public interest or convenience requires, the legislative body of any municipality may acquire or install any or all of the works and improvements mentioned in the Improvement Act of 1911[7] *or other works and improvements of a local nature,* and acquire by gift, purchase, or eminent domain proceedings land, rights of way, and easements necessary for such works and improvements.'' (Italics added.)

Section 5101, Streets and Highways Code, provides in pertinent part: ''Whenever in the opinion of the legislative body the public interest or convenience may require, it may order the whole or any portion, either in length or in width, of any one or more of the streets, *places,* public ways, or *property* . . . owned by any city, open or dedicated to public use, . . . to be approved by or have constructed *therein,* over or thereon . . . any of the following: (n) [Other work.] All other work which may be deemed necessary to *improve* the whole or any portion of such streets, *places,* public ways or property, or rights-of-way owned by such city. [Italics added.] (o) [Auxiliary work.] All other work auxiliary to any of the above, which may be required to carry out the same.''

 Public off-street parking lots are obviously ''works and improvements of a local nature.'' In *City of Whittier* v. *Dixon* (1944) 24 Cal.2d 664, 667 [151 P.2d 5, 153 A.L.R. 956], the court stated, ''Respondent contends that public parking places are not public improvements. . . . Just as public streets can be used for the parking of motor vehicles, property can be acquired for the same use. Moreover, public parking places relieve congestion and reduce traffic hazards and therefore serve a public purpose.'' In *Alexander* v. *Mitch-*

[7]The Improvement Act of 1911 (Sts. & Hy. Code, §§ 5000-6794.)

*ell* (1953) 119 Cal.App.2d 816, 827 [260 P.2d 261], we said of public off-street parking lots ''essentially they are primarily of local interest just as street and sewer projects are. . . . In *City of Whittier* v. *Dixon, supra,* 24 Cal.2d 664, it was held that parking places tend to stabilize a business section and thereby benefit the property in its vicinity so as to justify the levy of a special assessment. This, in effect, may be a holding that parking places are portions of public streets. If they are not, they are so similar in use and purport as to come within the same rule.''

*Federal Construction Co.* v. *Ensign* (1922) 59 Cal.App. 200 [210 P. 536] states: ''A definition of a 'local improvement' which seems to have commended itself to the courts of many jurisdictions, and which meets with our unqualified approval, is that given by the Arkansas supreme court in *Crane* v. *City of Siloam Springs, supra* [67 Ark. 36 (55 S.W. 955)] : 'If we look for the technical or legal meaning of the phrase ''local improvement'' we find it to be a public improvement, which, although it may incidentally benefit the public at large, is made primarily for the accommodation and convenience of the inhabitants of a particular locality, and which is of such a nature as to confer a special benefit upon the real property adjoining, or near the locality of the improvement.' '' (Pp. 216-217.)

Section 5101 provides that the legislative body may order the construction of innumerable works of improvement of a local nature which would not be installed in or along city streets, i.e., bomb or fallout shelters, public mooring places for water craft, wharves, piers, docks, slips, quays, moles ''or other utilities, structures, and appliances necessary or convenient for the promotion or accommodation of commerce, navigation, and the protection of lands within said city,'' statuary, fountains, parks, septic tanks, disposal plants, cesspools, breakwaters, levees, wells, dams, reservoirs, storage tanks, and tunnels for supplying water.

It is clear from the varied improvements provided in the other subdivisions of 5101 that the ''other work'' and ''auxiliary work'' provided in (n) and (o) and ''Any works, utility or appliances necessary or convenient for providing any other service,'' mentioned in section 10100 are comprehensive enough to cover off-street parking.

The appeal from the order denying new trial is dismissed and the judgment is affirmed.

Sullivan, P. J., and Molinari, J., concurred.