Opinion
 

 ZENOVICH, J.
 

 Petitioner County of Fresno requests this court to invoke its original jurisdiction to issue a writ of mandate to compel respondent James B. Malmstrom, the Fresno County Treasurer and Tax Collector, to serve notice of assessment and collect such assessments from property owners in a special assessment district pursuant to Streets and Highways Code sections 10404 and 10603.
 

 The City of Los Angeles joined in support of petitioner as amicus curiae.
 

 The facts underlying this petition are not in dispute.
 

 On December 19, 1978, petitioner (acting through the Fresno County Board of Supervisors) initiated assessment proceedings under Streets and Highways Code section 10000 et seq. (the Municipal Improvement Act of 1913) to construct certain improvements described as “Various Streets in Robinwood Subdivision, Fresno County Improvement District No. 205.” Petitioner intended to issue assessment bonds pursuant to Streets and Highways Code section 5000 et seq. (the Improvement Act of 1911) to represent the assessments levied. The petition alleges that all the requirements of the Streets and Highways Code were followed in the assessment procedure; respondent does not make an assertion to the contrary.
 

 However, respondent refused to serve the notice of assessment on the property owners involved or to collect the assessment, contending that the assessment in question would result in a levy of over 1 percent on the property in the district, in contravention of article XIII A, section 1,
 
 *978
 
 subdivision (a) of the California Constitution and that it constitutes a “special tax” that has not been approved by a two-thirds vote of qualified electors of the district, as required by article XIII A, section 4.
 

 Since the issues herein presented are of great public importance and should be resolved promptly, petitioner accordingly has properly invoked the exercise of our original jurisdiction.
 
 (California Housing Finance Agency
 
 v.
 
 Elliott
 
 (1976) 17 Cal.3d 575, 580 [131 Cal.Rptr. 361, 551 P.2d 1193];
 
 California Educational Facilities Authority
 
 v.
 
 Priest
 
 (1974) 12 Cal.3d 593, 598 [116 Cal.Rptr. 361, 526 P.2d 513]; Cal. Civil Writs (Cont.Ed.Bar 1970) § 8.5, p. 154.)
 

 Article XIII A of the California Constitution was adopted by the voters of this state in June 1978. The measure was designated on the ballot as Proposition 13 and commonly known as the Jarvis-Gann initiative. Our California Supreme Court, itself exercising its original jurisdiction to uphold the validity of article XIII A as a whole, stated that the article “in a number of particulars is imprecise and ambiguous” and described it as “a constitutional provision of a kind, similar to many others, which necessarily and over a period of time will require judicial, legislative, and administrative construction.”
 
 (Amador Valley Joint Union High Sch. Dist.
 
 v.
 
 State Bd. of Equalization
 
 (1978) 22 Cal.3d 208, 244-245 [149 Cal.Rptr. 239, 583 P.2d 1281].)
 

 The issues raised by petitioner involve the continued viability of the Improvement Act of 1911 (Sts. & Hy. Code, § 5000 et seq.) and the Municipal Improvement Act of 1913 (Sts. & Hy. Code, § 10000 et seq.). For over 60 years these laws have provided the most widely used procedure in California for the construction of a variety of public improvements including streets, sewers, sidewalks, water systems, lighting and public utility lines; property owners benefited by the improvements pay for these improvements either in cash or^'at their option, by installments over a period of time. (See Nichols,
 
 Comment: How Not to Contest Special Assessments in California
 
 (1965) 17 Stan.L.Rev. 247, 247-248.) Amicus curiae City of Los Angeles states that within its jurisdiction alone almost $15.5 million in streets, sewers, drains and incidental facilities were constructed in the three and one-half years ending December 31, 1978; almost half of the funding for these projects was paid by assessment procedures under these acts, with much of the remainder paid by federal grants as “matching funds.” Los Angeles also states it has similar projects pending with estimated construction costs of over $52 million.
 

 
 *979
 
 Therefore, in light of the uncertainty article XIII A has cast over the continued viability of procedures so widely used for such a long period of time to construct needed public improvements, we examine petitioner’s specific contentions.
 

 I.
 

 Article XIII A, section 1, subdivision (a), does not expressly limit special assessments, but is rather confined to “any ad valorem tax on real property.” However, subdivision (b) exempts from subdivision (a) “ad valorem taxes or
 
 special
 
 assessments” (italics added) approved by the voters prior to the time article XIII A became effective.
 

 Rules of construction and interpretation that are applicable when considering statutes are equally applicable in interpreting constitutional provisions.
 
 (Winchester
 
 v.
 
 Mabury
 
 (1898) 122 Cal. 522, 527 [55 P. 393]; 45 Cal.Jur.2d (1958) Statutes, § 97, p. 612.) What is excepted by a statute’s proviso should, in the absence thereof, be considered as included in the general terms of the statute.
 
 (People
 
 ex rel.
 
 Happell
 
 v.
 
 Sischo
 
 (1943) 23 Cal.2d 478, 493 [144 P.2d 785, 150 A.L.R. 1431]; 73 Am.Jur.2d (1974) Statutes, § 316, p. 466.) Moreover, terms used in a constitutional amendment are normally construed in light of existing statutory definitions. (Co
 
 unty of Sacramento
 
 v.
 
 Hickman
 
 (1967) 66 Cal.2d 841, 850 [59 Cal.Rptr. 609, 428 P.2d 593];
 
 Forster Shipbldg. Co.
 
 v.
 
 County of L. A.
 
 (1960) 54 Cal.2d 450, 455-456 [6 Cal.Rptr. 24, 353 P.2d 736].)
 

 And, as the California Supreme Court summarized other rules of interpretation in
 
 Amador Valley Joint Union High Sch. Dist.
 
 v.
 
 State Bd. of Equalization, supra,
 
 22 Cal.3d at pages 245-246:
 

 “Acknowledging as we must that article XIII A in a number of particulars is imprecise and ambiguous, nonetheless we do not conclude that it is so vague as to be unenforceable. Rather, in the usual manner, the various uncertainties and ambiguities may be clarified or resolved in accordance with several other generally accepted rules of construction used in interpreting similar enactments. Thus, California courts have held that constitutional and other enactments must receive a liberal, practical common-sense construction which will meet changed conditions and the growing needs of the people. [Citations.] A constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words. [Citation.] The literal language of enactments may
 
 *980
 
 be disregarded to avoid absurd results and to fulfill the apparent intent of the framers. [Citations.]
 

 “Most importantly, apparent ambiguities frequently may be resolved by the contemporaneous construction of the Legislature or of the administrative agencies charged with implementing the new enactment. [Citations.] In addition, when, as here, the enactment follows voter approval, the ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the probable meaning of uncertain language. [Citations.]”
 

 Respondent contends that section 1, subdivision (b), when read in conjunction with section 1, subdivision (a), requires an inference that all special assessments come within subdivision (a)’s limitations. Petitioner agrees that rules of construction require special assessments to be impliedly included in subdivision (a), but only those special assessments levied on an ad valorem basis.
 
 [1]
 
 Petitioner’s position is based on a contention that the word “ad valorem” in section 1, subdivision (b), modifies both
 
 “taxes
 
 or
 
 special assessments.
 
 ”
 

 First, we are of the opinion that a major thrust of article XIII A is aimed at controlling ad valorem property taxes. This concern was stimulated by a rapid increase in property values in California over recent years. Even assuming property tax rates had remained constant, this rapid increase in market value, when reflected in increased assessed value, resulted in large property tax increases which, for the most part, had not been offset by increased income of the property owners.
 
 [2]
 
 Thus, section 1
 
 *981
 
 limits the ad valorem tax rate to a maximum of 1 percent of market value; section 2 sets the 1975-1976 tax year as a “base” for assessed value and limits further increases to 2 percent per year; section 3 provides that the Legislature may not impose new ad valorem taxes on real property; and section 4 provides that cities, counties and special districts may not impose new ad valorem property taxes.
 

 Second, we are of the opinion that respondent’s construction would result in an illogical conclusion. Such a construction is contrary to the rules of interpretation. (See, e.g.,
 
 Amador Valley Joint Union High Sch. Dist.
 
 v.
 
 State Bd. of Equalization, supra,
 
 22 Cal.3d at p. 245;
 
 Fireman's Fund Ins. Co.
 
 v.
 
 Security Pacific Nat. Bank
 
 (1978) 85 Cal.App.3d 797, 815 [149 Cal.Rptr. 883].) Respondent’s construction would place local government entities in a rather precarious situation by forcing them into a Hobson’s choice of spending general tax funds either for expenditures to benefit the public at large or for projects to benefit certain individual property owners by funding improvements such as the construction of streets, sidewalks, gutters and sewers. Inherent in the concept of special assessments is the fact that certain property owners receive special benefits.
 
 (Spring Street Co.
 
 v.
 
 City of Los Angeles
 
 (1915) 170 Cal. 24, 30 [148 P. 217];
 
 Harrison
 
 v.
 
 Board of Supervisors, supra,
 
 44 Cal.App.3d 852, 856;
 
 Northwestern etc. Co.
 
 v.
 
 St. Bd. Equal.
 
 (1946) 73 Cal.App.2d 548, 551-553 [166 P.2d 917].) It would not be just to the general taxpayers of the political entity to use general funds to pay for such special benefits to a few property owners.
 
 (Roberts
 
 v.
 
 City of Los Angeles
 
 (1936) 7 Cal.2d 477, 491 [61 P.2d 323].) Thus, for practical purposes, a governmental entity would be deprived of the ability to fund the construction of major improvements for a particular area within its jurisdiction.
 

 Third, we find that the ballot arguments in favor of article XIII A support a conclusion that the article is aimed at
 
 general
 
 taxes and governmental spending. The arguments claimed that more than 15 percent of all governmental spending was wasted and that the article’s limitations would not affect property-related governmental
 
 services
 
 (as contrasted with property-related improvements) such as trash collection, police and fire protection and street light
 
 maintenance
 
 (as contrasted with
 
 installation
 
 in a limited area; cf.
 
 Roberts
 
 v.
 
 City of Los Angeles, supra,
 
 7
 
 *982
 
 Cal.2d 477). There is nothing in the ballot arguments favoring article XIII A to suggest it was intended to limit a governmental entity’s ability to improve certain areas within its jurisdiction by special assessments of the property owners specially benefited.
 

 While California has never been required to consider whether statutory or constitutional limitations on general tax assessments should apply to special assessments for improvements benefiting only specific parcels of property, the handful of sister states which have interpreted such statutory or constitutional provisions have concluded that special assessments do not fall within such limitations. (See, e.g.,
 
 Graham
 
 v.
 
 City of Saginaw
 
 (1947) 317 Mich. 427 [27 N.W.2d 42, 44-45];
 
 Hamilton
 
 v.
 
 Arch Hurley Conservancy Dist.
 
 (1938) 42 N.M. 86 [75 P.2d 707, 709-710];
 
 Northern Pac. Ry. Co.
 
 v.
 
 John Day Irr. Dist.
 
 (1923) 106 Ore. 140 [211 P. 781, 789];
 
 Wickliffe
 
 v.
 
 City of Greenville
 
 (1916) 170 Ky. 528 [186 S.W. 476, 478];
 
 Fourmy
 
 v.
 
 Town of Franklin
 
 (1910) 126 La. 151 [52 So. 249, 250];
 
 Mayor, etc., of Birmingham
 
 v.
 
 Klein
 
 (1890) 89 Ala. 461 [7 So. 386, 390]; and
 
 Dittoe
 
 v.
 
 City of Davenport
 
 (1888) 74 Iowa 66 [36 N.W. 895, 897].) While, of course, these decisions did not involve an interpretation of the specific provisions of article XIII A, they nevertheless support a conclusion that statutory or constitutional limitations on taxes have no logical application to special assessments to finance improvements benefiting special parcels of property within the taxing jurisdiction.
 

 Therefore, we conclude that the 1 percent maximum tax limitation imposed by article XIII A on ad valorem taxes does not apply to special assessments and bonds levied pursuant to Streets and Highways Code sections 5000 et seq. and 10000 et seq., the Improvement Act of 1911 and the Municipal Improvement Act of 1913.
 

 II.
 

 Respondent refused to collect the assessments in the present case in part because they had not been approved by two-thirds of the “qualified electors of the district,” contending that California Constitution, article XIII A, section 4, applied to such an assessment. (5a) For the reasons that follow, we are of the opinion that a special assessment levied pursuant to Streets and Highways Code sections 5000 et seq. and 10000 et seq. is not a “special tax” within the meaning of that constitutional provision, and therefore no election was required.
 

 
 *983
 
 As previously discussed, an examination of article XIII A itself and the ballot arguments favoring it support a conclusion that the initiative was aimed at cutting general governmental funds and expenditures. Section 4 of that constitutional provision is aimed at limiting local governments’ ability to replace funds reduced by other sections of the article by shifting to other types of taxes. However, special assessments are not general taxes but rather used to confer special benefit upon the parcels charged for the improvements.
 
 [3]
 

 Respondent is correct in pointing out that the power to create special assessments to pay the costs of improvements to specific parcels of property is a “peculiarly legislative process grounded in the taxing power of the sovereign.”
 
 (Dawson
 
 v.
 
 Town of Los Altos Hills
 
 (1976) 16 Cal.3d 676, 683 [129 Cal.Rptr. 97, 547 P.2d 1377].) This origin of the special assessment is perhaps one of the reasons the terms “tax,” “special tax” and “special assessment” have become at times hopelessly entangled in judicial opinions, legislation and legal treatises. (See, e.g.,
 
 County of San Bernardino
 
 v.
 
 Flournoy
 
 (1975) 45 Cal.App.3d 48, 52 [117 Cal.Rptr. 732]; 14 McQuillin, Municipal Corporations (1970 rev. ed.) Special Taxation and Local Assessments, § 38.01, p. 10.)
 

 Taxes are raised for the general revenue of the governmental entity to pay for a variety of public services. (46 Cal.Jur.2d (1959) Taxation, § 7, p. 488.) A “special tax” is a tax collected and earmarked for a special purpose, rather than being deposited in a general fund. (See
 
 City of Glendale
 
 v.
 
 Trondsen
 
 (1957) 48 Cal.2d 93, 99-100 [308 P.2d 1];
 
 City of San Diego
 
 v.
 
 Atlas Hotels, Inc.
 
 (1967) 252 Cal.App.2d 591, 594-595 [60 Cal.Rptr. 644].) A special assessment is charged to real property to pay
 
 *984
 
 for benefits that property has received from a local improvement and, strictly speaking, is not a tax at all.
 
 (Wells
 
 v.
 
 Union Oil Co.
 
 (1938) 25 Cal.App.2d 165, 166-167 [76 P.2d 696].)
 

 Supportive of the distinction between a tax and an assessment is the well-settled rule that exemptions of private property from taxation do not extend to special assessments levied upon the basis of equivalent benefit, unless specifically so provided
 
 {Estate of Simpson
 
 (1954) 43 Cal.2d 594, 597-598 [275 P.2d 467, 47 A.L.R.2d 991];
 
 Cedars of Lebanon Hosp.
 
 v.
 
 County of L.A.
 
 (1950) 35 Cal.2d 729, 747 [221 P.2d 31, 15 A.L.R.2d 1045];
 
 County of Santa Barbara
 
 v.
 
 City of Santa Barbara
 
 (1976) 59 Cal.App.3d 364, 379, 380 [130 Cal.Rptr. 615]; Ops.Cal.Legis. Counsel, No. 16240 (Nov. 13, 1978) p. 4.)
 

 Likewise, for purposes of the Personal Income Tax Law (Rev. & Tax. Code, pt. 10 (commencing with § 17001), div. 2), real property taxes, but not taxes assessed against local benefits of a kind tending to increase the value of the property assessed, are allowed as itemized deductions in computing taxable income (Rev. & Tax. Code, § 17204, subd. (a)(1), subd. (c)(6);
 
 Northwestern etc. Co.
 
 v.
 
 St. Bd. Equal., supra,
 
 73 Cal.App.2d at p. 553). Such is also the case under the Internal Revenue Code of 1954 (26 U.S.C.) for federal income tax purposes (26 U.S.C.A. § 164 (a)(1) and (c)(1);
 
 Denver & Rio Grande Western Railroad Co.
 
 v. C.
 
 I. R.
 
 (10th Cir. 1960) 279 F.2d 368, 370;
 
 Brecklein
 
 v.
 
 Bookwalter
 
 (W.D.Mo. 1970) 313 F.Supp. 550, 552; Ops.Cal.Legis. Counsel, No. 16240 (Nov. 13, 1978) p. 5).
 

 A special assessment is distinguishable from a property-related special tax by the fact that a special assessment, being a charge for benefits conferred upon the property, cannot exceed the benefits the assessed property receives from the improvement; a special tax on real property need not so specifically benefit the taxed property.
 
 (Spring Street Co.
 
 v.
 
 City of Los Angeles, supra,
 
 170 Cal. at p. 30;
 
 City of Sterling
 
 v.
 
 Galt
 
 (Ill. 1886) 7 N.E. 471, 473.) The owner of bonds securing the debt incurred by the property owner pursuant to the Improvement Act of 1911 may not look to the general funds of the governmental entity for payment, but is limited to the funds created by the payments made by the property owner. (Sts. & Hy. Code, § 6424.) Upon default on the bonds by the property owner, the bond owner’s only recourse is to foreclose upon the property securing the bond. (Sts. & Hy. Code, § 6500 et seq.)
 
 [4]
 

 
 *985
 
 Thus, we are of the opinion that the special assessment procedures of the Improvement Act of 1911 do not impose a “special tax.” And, since the special assessment has no impact upon general governmental spending—the overriding concern of article XIII A—a very broad and liberal construction of the term “special taxes” to include such special assessments is not required to fulfill the purposes of this constitutional provision.
 

 Moreover, the application of article XIII
 
 A,
 
 section 4, to special assessments under the Improvement Act of 1911 would present a myriad of practical problems. For example, the property to be improved may be entirely owned by one person; or resident property owners may outnumber nonresident property owners, or vice versa. These situations, and many others, could pose complex problems of defining the “qualified electors” of the district referred to in article XIII A, section 4, and provide more layers of governmental red tape and expense without practical benefit—the very such governmental waste article XIII A was designed to cut. However, the procedures set forth in the Municipal Improvement Act of 1913, used in this case, provided a method of notifying and accepting protests from all persons directly affected by the assessment—the property owners who would both be benefited by the improvements and charged with the cost of those improvements. (See Sts. & Hy. Code, § 10300 et seq.)
 

 Therefore, we conclude that article XIII A, section 4 of the California Constitution does not require the issuance of bonds pursuant to the Improvement Act of 1911 to be approved by an election of two-thirds of the “qualified electors of such district” because special assessments pursuant to the Municipal Improvement Act of 1913 and the
 
 *986
 
 Improvement Act of 1911 are not within the definition of “special taxes” of that section.
 

 Let a peremptory writ of mandate issue commanding respondent James B. Malmstrom, as County Treasurer and Tax Collector for the County of Fresno, to give notice of recording of assessments and collect said assessments pursuant to Streets and Highways Code sections 10404 and 10603 for those improvements duly authorized by the County of Fresno in the special assessment district designated “Various Streets in Robinwood Subdivision, Fresno County Improvement District No. 205.”
 

 Brown (G. A.), P. J., and Franson, J., concurred.
 

 Respondent’s petition for a hearing by the Supreme Court was denied September 12, 1979.
 

 [1]
 

 However, we note California Legislative Counsel opinion No. 16240, November 13, 1978,'at pages 5 and 6, opines that the formula on which special assessments are made must be based on the special benefits received. A general benefit inuring to the public as a whole will not justify an assessment.
 
 (Harrison
 
 v.
 
 Board of Supervisors
 
 (1975) 44 Cal.App.3d 852, 856 [118 Cal.Rptr. 828].) He further opines that a levy on all property, both real and personal, without regard to special benefits is a tax; but a levy made only upon land on the basis of benefits received, whether designated “benefit assessment” or “ad valorem assessment,” is a special assessment and not a tax (citing
 
 Trumbo
 
 v.
 
 Crestline Lake Arrowhead Water Agency
 
 (1967) 250 Cal.App.2d 320, 322-323 [58 Cal.Rptr. 538];
 
 Jeffery
 
 v.
 
 City of Salinas
 
 (1965) 232 Cal.App.2d 29, 45 [42 Cal.Rptr. 486], and listing the provisions of the Sts. & Hy. Code involved in the present case as examples of such special assessments).
 

 [2]
 

 In contrast to such general ad valorem taxes, the assessments in this case are more in the nature of loans to property owners for improvements benefiting their property, with bonds representing that loan and secured by the property itself. The bond reflects a specific total sum assessed against the parcel. (Sts. & Hy. Code, § 6400.) Each payment on the bond reflects principal and interest. (§§ 6440-6441.) The governmental entity cannot pay the bonds or the interest on the bonds out of funds other than those collected from the property owners. (§ 6424.) The assessment reflected by the bond does not continue
 
 *981
 
 indefinitely, but rather is for a set term and is extinguished upon completion of payment of the principal. (§§ 6448, 6462.) In such a bond program, the property owners do not receive the benefit of public funds, but merely are able to obtain loans at a cost below that of the marketplace because of the tax-exempt nature of the bonds issued. (See
 
 California Educational Facilities Authority
 
 v.
 
 Priest, supra, 12
 
 Cal.3d at p. 605.)
 

 [3]
 

 We note the enactment of chapter 29 of the Statutes of 1979 (ch. 29, § 7) referred to as “Senate Bill 55” designed to enable redevelopment agencies severely impacted by Proposition 13 to prevent bond defaults by using a special assessment process requiring a finding of benefit to each parcel of property; Senate Bill No. 785 introduced March 23, 1979, as amended May 30, 1979, stating a special tax “shall not include any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes.” Assembly Bill No. 1757 introduced April 5, 1979, as amended June 14, 1979, designed, among other things, to authorize drainage districts, under the Drainage District Act of 1903, to issue bonds to be paid from assessments spread upon the lands of the district in proportion to the benefits to be provided each parcel (but further note—by approval of a majority vote rather than a two-thirds majority vote of the qualified electors required by section 4 of article XIII A). California Legislative Counsel opinion No. 16240 issued November 13, 1978, discussing article XIII A and its applicability, among other things, to special assessments; 62 Ops. Cal. Atty. Gen. 254 (1979) defining a fee imposed under Government Code section 65974 as a “special tax” within the meaning of article XIII A, but not expressing any view on what assessments or taxes, if any, are “special taxes” within the meaning of said article.
 

 [4]
 

 We note section 6460 of the Streets and Highways Code wherein the bond to be issued must contain substantially the following language; “This bond is payable exclusively
 
 *985
 
 from said fund, [fund created by the payments made by the property owner] and neither the (here insert city or county) nor any officer thereof is to be holden for payment otherwise of its principal or interest.” Therefore, it is apparent that a special assessment bond (if and when issued by the petitioner herein) would not constitute a debt of the County of Fresno, or any political subdivision thereof, or a pledge of the full faith and credit of the County of Fresno or any political subdivision thereof. Distinguish this provision from the so-called “Moral Obligation” concept enacted in other jurisdictions. In those jurisdictions, the bonds, when issued, do not constitute a debt of the political entity nor a pledge of its full faith and credit. However, the political entity, to assure the continued solvency of its bonds and prevent default, is authorized to appropriate annually and pay into a reserve fund “tax dollars” in an amount equal to the maximum amount of principal and interest becoming due in any succeeding calendar year. (See
 
 Massachusetts Hous. F. Ag.
 
 v.
 
 New England Mer. Nat. B.
 
 (1969) 356 Mass. 202 [249 N.E.2d 599];
 
 New Jersey Mortgage Finance Agency
 
 v.
 
 McCrane
 
 (1970) 56 N.J. 414 [267 A.2d 24].)