[Civ. No. 11562.   Third Dist.   Feb. 8, 1968.]

AUBURN LUMBER COMPANY, Plaintiff and Appellant, v. CITY OF AUBURN et al., Defendants and Respondents.

---

James K. Norman for Plaintiff and Appellant.

Sturgis, Den-Dulk, Douglass & Anderson, and Edwin N. Ness for Defendants and Respondents.

FRIEDMAN, J.—The City of Auburn conducted proceedings for the formation of a parking district under the Vehicle Parking District Law of 1943 (Sts. & Hy. Code, § 31500 et seq.). Petitioner Auburn Lumber Company, a retail building materials merchant, protested inclusion of its business premises. The city council rejected the protest, fixed district boundaries embracing the lumber company's property and found that all property within these boundaries would be benefited by the project. Auburn Lumber then petitioned for review by mandate in the superior court, which, after considering the evidence before the city council, found substantial evidence to support the council's finding of benefit. Petitioner appeals from a judgment denying relief.

The Vehicle Parking District Law of 1943 permits the imposition of special assessments on lands within a district to finance the acquisition and construction of off-street parking facilities. After adopting an ordinance describing the boundaries of the district and giving notice of a hearing at which property owners may protest (Sts. & Hy. Code, § 31539), the legislative body may exclude land "which it finds will not be benefited by the doing of the things proposed to be done." (*Ibid.*, § 31551.) "Any land which in the judgment of the legislative body will not be benefited shall not be included in the district." (*Ibid.*, § 31556.) After the cost of the parking project is ascertained, it is assessed against the properties within the district "in proportion to the benefits to be derived . . . ." (*Ibid.*, § 31623.)

The present suit was filed after the protestant's property had been included in the district boundaries but before spread of the assessment. In contrast, reported decisions reviewing city council actions under the 1943 law involve lawsuits commenced after formation of the district and after allocation of assessments to the individual properties.[1] ▮▮▮ The initiation of judicial proceedings before spread of the assessment

[1]*Yaeger* v. *City Council of the City of Fullerton*, 231 Cal.App.2d 557 [41 Cal.Rptr. 904]; *Jenner* v. *City Council of the City of Covina*, 164 Cal.App.2d 490 [331 P.2d 176]. A parking assessment case arising under another improvement act, *Jeffery* v. *City of Salinas*, 232 Cal.App.2d 29 [42 Cal.Rptr. 486], also resulted from a suit filed after the protestant's property had been assessed in a specific amount. In *Safeway Stores, Inc.* v. *City of Burlingame*, 170 Cal.App.2d 637 [339 P.2d 933], a case arising under the Parking District Law of 1951, the action was filed after inclusion of the protestant's property within the district but before

causes a shift in the focus of judicial review. The decision of the local administrative body will be sustained in court if there is substantial evidence to support it.[2] After spread of the assessment the reviewing court has before it the issue of the administrative agency's compliance with Streets and Highways Code, section 31623, that is, whether there is substantial evidence of an assessment proportionate to benefit.[3] Where, as here, the project cost has not been allocated among the individual properties, the issue is one of compliance with sections 31551 and 31556, that is, whether there is substantial evidence of some benefit to the protestant's property. When the benefit is palpable but relatively small, neither the landowner nor the court may anticipate an individual assessment disproportionate to the benefit.[4] Under these circumstances substantial evidence of any palpable benefit to the protestant's property will result in judicial affirmance of the agency's action.

After the Auburn city council published notice of a hearing, Auburn Lumber Company filed a protest, urging lack of benefit to its property. Facts supporting its protest were described in a verified declaration by one of its officers, supported by affidavits of a number of its customers, mostly building contractors. The company contended: (1) An existing city parking lot in close proximity to its property and existing on-street parking spaces were not being used to capacity; (2) the company had parking facilities on its own premises for 78 cars, no more than 50 of which were in use at peak business hours; (3) because the company sold bulky items, its customers could not utilize parking lots at any distance; (4) the exterior boundary of the proposed district bisected the lumber company's business premises, running down the center of its office and sales floor.[5]

---

spread of the assessment. A 1959 amendment requires that an action to review or annul the ordinance declaring formation of the district must be commenced within 60 days of the ordinance's adoption. (Sts. & Hy. Code, § 31568.1.)

[2]*Jeffery* v. *City of Salinas, supra,* 232 Cal.App.2d at p. 35; *Jenner* v. *City Council of the City of Covina, supra,* 164 Cal.App.2d at p. 497.

[3]See *Spring Street Co.* v. *City of Los Angeles,* 170 Cal. 24, 31 [148 P. 217, L.R.A. 1918E 197]; *Keller* v. *City of Los Angeles,* 123 Cal.App. 99, 105-106 [11 P.2d 448].

[4]See *Howard Park Co.* v. *City of Los Angeles,* 119 Cal.App.2d 515, 522 [259 P.2d 977].

[5]The proposed district included the lumber company's premises on its own land but excluded part of its premises on land leased from the Southern Pacific Company.

At the city council hearing on September 7, 1965, petitioner's representatives called attention to the protest and to its factual basis. The council then received an oral statement from Dr. D. Jackson Faustman. Dr. Faustman was one of the individuals retained by the city council to prepare a comprehensive parking and traffic plan for the downtown district of Auburn. The record reveals his background and qualifications only to the extent that he had conducted 75 or 80 parking studies. Dr. Faustman commented on the proposed inclusion of the Auburn Lumber Company's premises.[6]

Two weeks later, on September 21, 1965, the city council met again to reconsider the proposed district. At the latter session Dr. Faustman made additional statements. In effect, he declared that he had included property within the proposed boundaries which met two criteria: one, they were zoned for commercial use and two, located within walking distance, that is, within 350 feet, of one of the proposed off-street parking lots. He pointed out that the 350-foot circle included the commercially zoned property owned by the

---

[6]Dr. Faustman stated: ''In answer to the questions about inclusion of the Auburn Lumber Company, yes, I was the one who made the decision. I would like, however, to take exception to the second part of the statement that was just made here, the fact that they were put in the District because we needed the assessed valuation. I don't recall that I ever made that particular comment. But my reasons for including portions of the Lumber Company were involved with the fact that the more I looked at the distribution of the several parking facilities, bearing in mind that these facilities are devoted primarily for short-time parkers, not long-time parkers but short-time parkers. I mean, as people come into the central business district for retail, commercial types of activities, medical, dental and the like, these are the types of uses that take the average parker less than two or three hours. The more I looked at this distribution the more I realized how in the world could I exempt properties laying literally adjacent to a parking facility? The Auburn Lumber Company is in the retail business, whether they are selling paint, lumber, bolts or nuts, but they are in the retail business, and certainly in the long run—and after all this is a long-run program. Those bonds, for example, are twenty-year payoff. In the long run, parking conditions in this town will change, as they have in the last ten, fifteen or twenty years. Twenty years ago you had no parking problem. Today you don't have as much as say Sacramento or Los Angeles or San Francisco, but you certainly have a city which is growing. And in the long run, I could not in my own professional judgement exempt a large parcel of land now being used for retail purposes, and in the future, in the more long run perhaps more extensively used. In terms of commercial development, how could we exempt this property from the District? And I came to the conclusion under these circumstances, no, we could not, and for that reason I changed the boundaries from our very preliminary planning studies Mr. Fraser and I conducted, where we had gone before the Planning Commission. I changed my opinion and included the Auburn Lumber Company, their portions of land in the District. I think that in effect was my reasoning behind it.''

Auburn Lumber Company, but excluded the land it leased

from the Southern Pacific Company. He declared that the commercially zoned property of Auburn Lumber Company "could be put into any type of use which would attract automobiles. . . ." At the conclusion of the September 21 session the council adopted a resolution rejecting all protests, including that of petitioner.

Petitioner's central claim is that Dr. Faustman's testimony fails to meet the law's notion of substantial evidence as "reasonable in nature, credible and of solid value," citing *Estate of Teed,* 112 Cal.App.2d 638, 644 [247 P.2d 54]. It argues that Dr. Faustman did not describe any special benefit whatever to the lumber company's property, simply expatiating on his own motives and criteria for including property within the district.

The city council action does not rest on Dr. Faustman's testimony alone. Both opponents and supporters of the project made statements before the council. Some supporting statements emphasized the number and identity of the downtown entrepreneurs who supported the project rather than the enhancement of community and property values. A Mr. Frank Ostrow described activities in other California communities to demonstrate the point that "core area" parking is necessary to meet the competition of suburban shopping centers and to prevent the deterioration of downtown property values.

Regardless of the comparative weight of the competing evidential factors, the record before the city council embodies substantial evidence of palpable benefit to petitioner's property. The property is within the downtown area of the City of Auburn. Only hinted in the record is the physical configuration of the downtown area, which appears to be situated on a hillside, embracing an "upper town" and "lower town." The Auburn Lumber Company is situated in the elevated portion of the downtown. Its property is 50 feet to 75 feet laterally distant from an existing city-owned parking lot and 350 feet from one of the proposed parking lots, but at a higher elevation than either. Motorists using these parking facilities would be required to walk up the hill to do business with the lumber company. Nevertheless, there is no question but that petitioner's property is within downtown Auburn. It is a landowner as well as a merchandiser. The prospect of increased sales volume on its particular business property is not an indispensable ingredient of the benefit which supports a special assessment. The prime ingredient of benefit is an enhancement of the property's market value in relation to

738

reasonably potential uses as well as present use.[7] In *City of Whittier* v. *Dixon,* 24 Cal.2d 664, 667-668 [151 P.2d 5, 153 A.L.R. 956], the court observed that off-street parking places tend to stabilize a business section, benefiting the property in the vicinity and justifying the imposition of special assessments. In *Alexander* v. *Mitchell,* 119 Cal.App.2d 816, 827 [260 P.2d 261], the court takes notice of common knowledge that automobile traffic congestion is depressing downtown business and downtown property values in large and small cities. Mr. Ostrow's testimony before the city council simply echoed these truisms of modern urban development.

Reexamined in the light of these truisms, Dr. Faustman's testimony takes on more specific character than appears at first blush. At the September 7 meeting he pointed to the Auburn Lumber Company property "in terms of commercial development," and as a "large parcel of land now being used for retail purposes, and in the future, in the long run perhaps more extensively used."[8] At the September 21 meeting he reiterated the property's availability for "any type of use which would attract automobiles. . . ." So viewed, Dr. Faustman's testimony supplied substantial evidence from which the city council could find a palpable benefit to petitioner's land in the form of enhancement of its market value as commercially zoned, downtown property.

Petitioner invokes *Safeway Stores, Inc.* v. *City of Burlingame, supra,* 170 Cal.App.2d 637, a parking district case, in which a finding of special benefit to the protestants' retail business properties was annulled. There, however, the unrefuted evidence demonstrated a deliberate gerrymandering of district lines, not by the yardstick of benefits but to embrace property owners who would support the project and exclude those who might obstruct it. There is no claim or evidence of gerrymandering here.

Petitioner charges violation of statutory procedures in the city council's reception of testimony at its meeting of September 21, 1965, following the regularly noticed hearing of September 7. Toward the end of the September 7 hearing one of the councilmen proposed a motion as follows: ". . . I

---

[7]*Howard Park Co.* v. *City of Los Angeles, supra,* 119 Cal.App.2d at p. 522, cited in *Jeffery* v. *City of Salinas, supra,* 232 Cal.App.2d at p. 37, footnote 4. See also *Spring Street Co.* v. *City of Los Angeles, supra,* 170 Cal. at p. 30; *Safeway Stores, Inc.* v. *City of Burlingame, supra,* 170 Cal.App.2d at p. 645; *Lloyd* v. *City of Redondo Beach,* 124 Cal.App. 541, 547 [12 P.2d 1087].

[8]Footnote 6, *supra.*

would like to move that the hearing be closed and that the consideration of the protests be continued to September 21." The motion was seconded and adopted. At the September 21 council meeting both Dr. Faustman and the city's bond counsel restated the background of the parking district proposal and their reasoning in laying out the proposed boundaries. Petitioner's counsel was present but declined to participate on the ground that the continued hearing was illegal.

The parking district statute provides that the publicly noticed hearing "may be continued from time to time by order entered on the minutes." (Sts. & Hy. Code, § 31552.) Petitioner's argument takes too much advantage of unfortunate terminology on the part of the councilman who made the motion. Although he literally proposed that the hearing be "closed," the remainder of his motion gave evidence of an intention to recess or continue the entire proceeding to the later date. That it was so understood is evidenced by the presiding officer's opening statement at the September 21 meeting: "The next item is the continued meeting in the matter of Vehicle Parking District No. 1. . . ." The September 21 meeting was not a rump or secret session designed for evasion, but a publicly announced continuation of the hearing in substantial compliance with section 31552.

█ Petitioner assigns error in the trial court's rejection of an offer to prove that two of the four councilmen who voted to reject its protest had been active promoters of the parking district. Whatever the merits of this objection, petitioner did not raise it before the city council and is precluded from raising it in court.[9]

Judgment affirmed.

Pierce, P. J., concurred.

REGAN, J.—I dissent:

On July 20, 1965, respondent City of Auburn enacted Ordinance No. 542 giving notice of its intention to form Vehicle Parking District No. 1, and set September 7, 1965, as the time for a public hearing on objections and protests to the proposed enactment. Petitioner, the owner of property within the

_____

[9]Streets and Highways Code section 31565; *Jeffery* v. *City of Salinas, supra,* 232 Cal.App.2d at p. 39. Section 31565 declares: "Proceedings under this chapter shall not be attacked after the hearing upon any ground not stated in an objection or protest filed pursuant to this chapter. Any landowner or person interested in any land within the district is estopped to attack the proceedings upon any ground not stated in a protest filed by him pursuant to this chapter."

boundaries of the proposed district, along with others, appeared on the date set and presented its objection to having its property included in the proposed district and to the formation proceedings. Protests, oral and written, were presented, as well as evidence, on behalf of the proponents of the district and thereafter the council closed the public hearing and continued the consideration of the protests until September 21, 1965.

In January 1963 the Auburn City Council had retained Mr. Earl Fraser and Dr. D. Jackson Faustman to prepare a comprehensive plan for the downtown district of Auburn. When the plan was submitted there was included a traffic parking plan for the city's central district. Dr. Faustman gave testimony at the September 7, 1965, hearing in support of his decision to include petitioner's property within the proposed district.

At the meeting held on September 21, the city council permitted Dr. Faustman to review the method used to determine the district boundaries and permitted the city's bond counsel to comment on the petitioner's protests. A representative of petitioner was invited to make any comment he wished, but he declined, stating that the meeting was not a ''noticed hearing'' and thus he had no right to speak. After reviewing all the protests, the city council adopted Resolution No. 1014 denying all of the protests, including that of petitioner.

On October 5, 1965, the council adopted Ordinance No. 544, forming Vehicle Parking District No. 1 in the City of Auburn. Thereafter, petitioner brought this action for a writ of mandate. The trial court found that: (1) the findings of the council were supported by the evidence; (2) the council did not commit any prejudicial abuse of discretion within the meaning of section 1094.5, subdivision (b), of the Code of Civil Procedure;[1] (3) the procedure adopted by the council in closing the public hearing on September 7 and continuing the consideration to September 21, and the procedure then adopted on September 21, is in substantial compliance with the law; and (4) petitioner was afforded a fair hearing.

1. *Was there substantial evidence of special benefit?*

Petitioner first contends there was no substantial evidence of special benefit to its property to justify inclusion within

---

[1] The pertinent portion of this section provides: ''Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order of decision is not supported by the findings, or the findings are not supported by the evidence.''

the proposed parking district, and urges that under section 1094.5 of the Code of Civil Procedure the inquiry in this proceeding is whether prejudicial abuse of discretion has been established by a showing that the findings of the council are not supported by substantial evidence in the light of the whole record.

The basis for a legal right to impose special assessment district taxes upon property rests upon the theory of special benefit to the specific property to be taxed. (*Yaeger* v. *City Council,* 231 Cal.App.2d 557, 562 [41 Cal.Rptr. 904] ; *Federal Constr. Co.* v. *Ensign,* 59 Cal.App. 200, 209-210 [210 P. 536].) The rules applicable to review in cases such as this are set forth in *Jeffery* v. *City of Salinas,* 232 Cal.App.2d 29, 35 [42 Cal.Rptr. 486] : ''Preliminarily, it is well to bear in mind that, as here, in reviewing the action of a city council, the superior court may not hold a trial de novo, but concerns itself solely with the presence, or absence, of substantial evidence in the record made at the hearings before said council which will support the determination of the council. [Citations.] ''

By the terms of sections 31551 and 31556 of the Streets and Highways Code, absence of benefit is the criterion for determining whether specific property will be excluded from a proposed vehicle parking district. (*Yaeger* v. *City Council, supra,* 231 Cal.App.2d at pp. 559-560.) The Vehicle Parking District Law of 1943 (Sts. & Hy. Code, § 31500 et seq.) creates a *presumption of benefit* as to the property to be included in a proposed vehicle parking district; thus, an objecting property owner has the burden of going forward with evidence in mitigation of this presumption. (*Yaeger* v. *City Council, supra,* at pp. 560-561.) Furthermore, it is well settled that when jurisdiction is given to a board to pass upon the question of benefits, the courts will not disturb their finding, unless there appears a clear and palpable abuse of such discretion. (*Yaeger* v. *City Council, supra,* at p. 561; see also *Jenner* v. *City Council,* 164 Cal.App.2d 490, 497 [331 P.2d 176].)

Petitioner introduced substantial evidence at the council hearing that there would be no special benefit to its property from the construction of new parking facilities. A city councilman also gave testimony relative to special benefit.[2] The

---

[2] ''COUNCILMAN GRAVATT: If no one else has any comments at this time, I do. Again, the high concentration of traffic, choked traffic in the business district here, it is rare when you can find a lot in the middle of it. Once in a while you can put in additional lots to help out the intense areas, and that is fine. Usually you have to go to the outer

''primary thrust'' of petitioner's objections can be summarized as follows: (1) Construction of a new parking lot would not specially benefit plaintiff's property since existing lot and on-street parking facilities during peak business hours are not presently being used to capacity; (2) petitioner, at its own expense and on its own property, has provided 78 off-street

perimenter if you are going to make them at all. And in this case the places that are highly concentrated along here will greatly benefit from this, these types of businesses. Now, located over here, for an example, is the Placer Mart, and that obviously will benefit by more parking in their particular situation; but it is split here by this street, and I don't think Safeway particularly would benefit from this District and shouldn't be in it. I think it is the same way with Lucky, and that is why they weren't included.

''I feel that the Auburn Lumber Company is like the kingdom of Liechenstein, which is a kingdom more unto itself, off by itself. And I feel their main offices are located up on a street there where there are no meters even in areas in front of them. And they provide all sorts of space, not only in their parking lot but throughout where they have their lumber stacked. Their types of customers are not the same type as those who go in the Laundromat or into the Chicken Kitchen. With the business they have they go to the central office, just like they do at Lucky's and over at Safeway's, and conduct their main business there. From there they go back out into the yard and they pick up their merchandise in trucks, and so on, and haul it away. So I feel that the Auburn Lumber Company is not benefited by this Parking District any more than Lucky's store or Safeway, and I don't think they ought to be in it.

''CHAIRMAN FELLOWS: Any further comment on the Auburn Lumber Company?

''COUNCILMAN EISLEY: Even though the property is adjacent to the existing parking lot and the property borders that parking lot?

''COUNCILMAN GRAVATT: Here is the existing parking lot, and here is another piece of property in here. Up at this end of the City is their central office. The Central Savings is up here, and their main offices are here, and their hardware building and materials (indicating). Their types of customers go clear up in here. They never go in this parking lot. They even aren't on the street. They provide all sorts of parking here just like these people have done over here. And I can't see with the operations such as they are today there, that they will be benefited by this Parking District. They are beyond the outer fringe. The outer fringe stretches just about through here (indicating). But their type of business is, I feel, and I say again, like Monte Carlo, they are out here by themselves; they are way up here where they are somewhat isolated. At some time in the future if they change their type of business and want to take out the lumber and put in more parking, that will benefit their hardware store and paint store, and so on.

''CHAIRMAN FELLOWS: Is it the opinion of any other member of the Council that this piece of property should be excluded? Any further discussion on this?

''MAYOR GORDON: Well, I feel that all the arguments for inclusion of the other properties also relate to this piece of property. Surely we couldn't in all good conscience exclude that piece of property, which is directly across from another protestant.

''COUNCILMAN REEVES: I feel that the portion of the Auburn Lumber Company that has been put in the District by Dr. Faustman will benefit. It is separated from the main lot by one small home. I don't know what

parking spaces, no more than 50 of which are occupied during peak business hours; (3) by reason of the nature of its business, petitioner's customers could not utilize off-street parking facilities at a distance, for the lumber business parking adjacent to the source of supply for the loading of heavy, bulky items; and (4) the boundary as drawn is illogical as to special benefits since it runs down the middle of the main office building and sales floor of the business. In rebuttal respondent offered the testimony of Dr. Faustman given at the September 7, 1965, meeting and reviewed by him at the September 21, 1965, meeting; the testimony of a representative of the Placer Herald on the benefits of parking and its need in community development as it builds for the future; and the comment of a city councilman who commented he viewed the area and believed petitioner's property would benefit.

The state of mind of the judge of the superior court as to this evidence is found in the court's express statements prior to announcing his decision. We quote:

"THE COURT: All right. Then that brings us to the main issue, is there in the record any substantial evidence that the Auburn Lumber Company is receiving any benefit.

"MR. NESS: [Counsel for respondent] Right.

"  .   .   .   .   .   .   .   .   .   .   .   .

"THE COURT: I am inclined to take the position that if I had been a member of the City Council of Auburn and voted at the hearing on this issue of whether the Auburn Lumber Company had a benefit, I would have voted that it did not,

---

the footage is on that home but I don't think it is more than 75 feet.

"MR. ROGERS: They are actually contiguous on the east side.

"COUNCILMAN REEVES: Yes, but on the front of it, it is separated by the Pullen home only.

"MAYOR GORDON: The parking lot is here and this is her property (indicating). They back right now onto the parking lot. If this piece of property were to change, I think they would have an entrance to the back end of this parking lot now.

"COUNCILMAN REEVES: Right off the lot?

"MAYOR GORDON: Yes.

"COUNCILMAN REEVES: I have certainly given this a lot of thought, and I have driven up there and looked at it, and driven through the back yard and looked at it, and I have given it a lot of thought and I can't but feel that it is going to benefit. I think Mr. Mikkelsen said at the public hearing that he didn't feel anybody would walk up the hill. But it isn't too far up that hill to their business building, that hill isn't that steep, and I do feel that they will benefit according to what they are assessed.

"CHAIRMAN FELLOWS: Any further comment?

"COUNCILMAN EISLEY: It is my feeling that really because they are so close to it that they will benefit in time, if they don't do it right now; twenty years is quite a while, and since that property is so close to it."

because I think that the greater weight of the evidence and of the law is that they are not benefited. But that still leaves the question, is there evidence to contradict that of any substantiality. You have the evidence of your expert expressing the opinion that he thinks it will be benefited, and you have the evidence also of one of the councilmen who went out and took a look and reported as a result of his view he felt that there was a benefit. Now, that is rather sketchy but does it warrant the dignity of being substantial evidence or doesn't it?

''. . . . . . . . . . . . .

''THE COURT: . . . .

''I repeat, although it is unnecessary, that you don't have to argue with me to convince me. Reading the cold record, and knowing no more about the problem than that in the City of Auburn, which I assume is having a problem, as are many cities and towns, but knowing no more about it than the cold record, I would think the greater weight of the evidence indicates rather clearly that the Auburn Lumber Company will receive no benefit from this parking district.''

Notwithstanding this comment the trial court found there was substantial evidence properly before the city council for its decision to include petitioner's property within the vehicle parking district, and ordered judgment to be entered denying petitioner a peremptory writ of mandamus, prohibition and certiorari.

Whether or not respondents have placed in the record of its proceedings substantial evidence of special benefit to petitioner is a close question.

Respondent's main witness arrived late at the September 7, 1965, meeting, after petitioner's written protest had been read and its attorney had made an oral statement. Respondent's witness was introduced in the following manner: ''. . . [A]nd Dr. Faustman is here now and questions that could not be answered at that time can be answered now.'' Dr. Faustman made a presentation and engaged in a question and answer session. *He was not further identified nor were his qualifications made a matter of record.*

The pertinent portions of Dr. Faustman's testimony at this meeting read:

''In answer to the questions about inclusion of the Auburn Lumber Company, yes, I was the one who made the decision. I would like, however, to take exception to the second part of the statement that was just made here, the fact that they were put in the District because we needed the assessed valuation. I

don't recall that I ever made that particular comment. But my reasons for including portions of the Lumber Company were involved with the fact that the more I looked at the distribution of the several parking facilities, bearing in mind that these facilities are devoted primarily for short-time parkers, not long-time parkers but short-time parkers. I mean, as people come into the central business district for retail, commercial types of activities, medical, dental and the like, these are the types of uses that take the average parker less than two or three hours. The more I looked at this distribution the more I realized how in the world could I exempt properties laying literally adjacent to a parking facility? The Auburn Lumber Company is in the retail business, whether they are selling paint, lumber, bolts or nuts, but they are in the retail business, and certainly in the long run—and after all this is a long-run program. Those bonds, for example, are twenty-year payoff. In the long run, parking conditions in this town will change, as they have in the last ten, fifteen or twenty years. Twenty years ago you had no parking problem. Today you don't have as much as say Sacramento or Los Angeles or San Francisco, but you certainly have a city which is growing. And in the long run, I could not in my own professional judgment exempt a large parcel of land now being used for retail purposes, and in the future, in the more long run perhaps more extensively used. In terms of commercial development, how could we exempt this property from the District? And I came to the conclusion under these circumstances, no, we could not, and for that reason I changed the boundaries from our very preliminary planning studies Mr. Fraser and I conducted, where we had gone before the Planning Commission. I changed my opinion and included the Auburn Lumber Company, their portions of land in the District. I think that in effect was my reasoning behind it.''

At the September 21 meeting Faustman testified that he established the boundaries of the district by using two different standards. He first of all included properties zoned commercial in the area. Secondly, the district included all property within approximately 350 feet of any parking facility to be acquired by the district, or what is considered to be a reasonable walking distance from the facility to a particular property.

The meeting of September 21 was as informal as that of September 7. The record is as follows:

''MR. NESS: . . . [I]t is my suggestion that you begin the

program by calling on Dr. Faustman to again reiterate to the Council and for the people present who are interested exactly how the boundaries of the District came to be laid out in the first place, and give us a general rundown on the project.

"CHAIRMAN FELLOWS: Dr. Faustman, if you will, please."

Dr. Faustman was not further identified. He did mention: ". . . this City Council retained Mr. Earl Fraser, Planning Consultant Director of Sacramento County, and myself to prepare a comprehensive plan for the downtown district. . . . Along with that we presented to this Council on June 25, 1963, a parking plan, traffic parking plan, for the central district. . . .

". . . This parking plan—and I can show you a lot of exhibits here, which I won't concerning the evolvement to the District boundaries. I want to reiterate that the criteria for establishing the District boundaries as we are now discussing them tonight, which are outlined in red on this map and in green on the map behind there, took into consideration two basic factors.[3] Number one, the zoning. It is my belief that properties that are zoned commercial and retail will benefit from parking. This means some of those properties may actually be other than retail or commercial in use, but if they are zoned for commercial use, they should be included in any parking district. And this is a broad generalization which applied to any parking district anyplace. I have seen this in other communities. So that is the criteria which we applied to these boundaries, and it reflects the same generalization of commercial zoning patterns.

"Another important factor which I took into consideration was the fact that properties in order to be benefited by a parking program, should be in what is considered to be a reasonable walking distance for people who are going to park and walk to the particular property. And experience has shown that the smaller the city the shorter the distance people will walk. I have personally conducted some 75 or 80 parking studies, in which we have tried to determine through various criteria how far these walking distances are; and there have been studies, of course, conducted by the Bureau of Public Roads, the Federal Government, and other private agencies. The point I am making, a community of this size, one block, or say 350 feet, is the reasonable walking distance from a facility to a particular piece of property in order for that

---

[3] These exhibits are not in the record.

property to enjoy the benefits of the parking. So with that as the criteria, we took from the corner of each of these proposed parking facilities, as well as the existing parking lots which are proposed to be improved and incorporated into the District, from each of these corners then I circumscribe 350 feet radii, and we found, for example, from the corner of the proposed parking lot on Lincoln Way and Cherry, if we put the 350 feet circle, it exactly hits the property line which divides the Auburn Lumber Company from the S. P. property.

"So in reviewing again, the fact we are no longer proposing a major street through here, and that the Auburn Lumber Company lays within the 350 foot boundary, at that time I came to the conclusion and decision that those boundaries, if we were to apply them equally and equitably across the 350 foot criteria, you had to include the Auburn Lumber Company property. Similarly, if you take it from this point and circumscribe this circle, you will find around all of the 350 foot radii, for example, that it touches into the middle of the block, High, Lincoln, Cleveland, Harrison (indicating). So if you follow that whole process out here you will find that these district boundaries were in effect guided by, number one, the walking distance; and number two, the zoning."

Later Dr. Faustman was asked:

"MR. NESS: Would you say the Auburn Lumber Company benefits, in your opinion?

"DR. FAUSTMAN: They lie within a 350 foot radius, and by reason of reasonable walking distance from not only the proposed facility but the existing parking lot, so that when this program is consummated the major parking facility of the entire central business district will lie, in effect, next door to the retail uses of the Auburn Lumber Company, or the property owned by the Auburn Lumber Company, which is zoned commercial, which could be put into any type of use which would attract automobiles, and thus the resultant need for parking."

At this juncture the appeal is balanced on the side of respondent by the presumption of benefit to property to be included in the proposed district, the testimony of Dr. Faustman, the Placer-Herald representative and the city councilman who viewed the area, and on petitioner's side by its substantial evidence of absence of benefits to its property.

This case is distinguishable on the facts from *Yaeger* v. *City Council, supra,* 231 Cal.App.2d 557, wherein petitioner

presented no evidence to establish lack of benefit to her property and thus could not overcome the presumption of benefit together with other supporting evidence in the record. Judgment there against petitioner was proper.

In the instant case I find no *substantial* evidence of benefit in the record. The mere view of a city councilman, otherwise not identified, and his general conclusion without supporting testimony, the lengthy presentations of Dr. Faustman and the Placer-Herald testimony, also unidentified as to his qualifications, amounting only to general conclusions of special benefit to petitioner's property, do not add up to *substantial* evidence.

In *Roberts* v. *Trans World Airlines*, 225 Cal.App.2d 344, 353 [37 Cal.Rptr. 291], this court said: ''The appellate court's approach to its task of limited review is described in *Gerhardt* v. *Fresno Medical Group, supra,* 217 Cal.App.2d at page 361 [31 Cal.Rptr. 633] : 'The first question that naturally comes to mind is what constitutes substantial evidence? The term is difficult to define as an isolated concept because the evidence to be weighed as well as the issue which the evidence is professed to prove is always peculiar to the individual case. The United States Supreme Court has said that ''Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'' (*Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U.S. 197, 229 [83 L.Ed. 126, 140, 59 S.Ct. 206, 217].) California courts have approved the reasonable-mind standard in testing the sufficiency of evidence. For example, in the early case of *Houghton* v. *Loma Prieta Lbr. Co.,* 152 Cal. 574 [93 P. 377], the Supreme Court, in discussing their term ''substantial evidence'' uses the test of whether the evidence would appeal to a fair and reasonable mind.' ''

In *Lorimore* v. *State Personnel Board,* 232 Cal.App.2d 183, 187 [42 Cal.Rptr. 640], the court said: ''Where findings are devoid of evidentiary support, or are based upon inferences arbitrarily drawn and without reasonable foundation, or are contrary to facts universally accepted as true and judicially known, the administrative order will be reversed as not being supported by substantial evidence in the light of the whole record.''

In *Martin* v. *Alcoholic Beverage etc. Appeals Board,* 52 Cal.2d 238, 246 [340 P.2d 1], the court said: ''The phrase 'substantial evidence in the light of the whole record' is not

new in the law of this state. It has been embodied in section 1094.5 of the Code of Civil Procedure at all times since the enactment of that section in 1945. (Stats. 1945, ch. 868, p. 1636.) The quoted language, as used in section 1094.5, had been considered by this court prior to the adoption of the constitutional amendment in 1954 [citation], and more recently, the meaning of a similar phrase—'based upon the entire record'—was considered by this court. [Citation.] The cited cases and others show that such phrases have been consistently construed as signifying no more than the adoption by the Legislature, for particular purposes, of the 'substantial evidence' rule as generally applied in judicial proceedings in this state rather than the 'scintilla' rule, which has been applied in judicial proceedings in some other jurisdiction.'' (See also *Estate of Teed,* 112 Cal.App.2d 638, 643-644 [247 P.2d 54].)

I point out here that neither the city councilman, the newspaper representative, nor Dr. Faustman, *on the record before us,* was an expert whose opinion, as given, was entitled to weight as such, and their opinions, as expressed, do not constitute substantial evidence of special benefit to petitioner.

It is stated in *City of Whittier* v. *Dixon,* 24 Cal.2d 664, 668 [151 P.2d 5, 153 A.L.R. 956], that ''[p]arking places that tend to stabilize a business section, by making it readily accessible to trade, benefit the property in the vicinity.'' However, on the record before this court it is not established by substantial evidence that petitioner's property is ''in the vicinity.'' The substantial evidence is to the contrary.

Where, as here, private property is to be impressed with the levy of a special assessment the property owner and the public are entitled to something more than the slipshod presentation as was made by respondent. Truly, we may say here that this proceeding was a ''h—— of a way to run a railroad.''

The judgment of the trial court should be reversed.

Appellant's petition for a hearing by the Supreme Court was denied April 4, 1968.